# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 06-764V
### (To be Published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| NATALIA GLASER, *parent of* | \* | |
| M.G., *a minor*, | \* | Filed: June 6, 2016 |
| | \* | |
| Petitioner, | \* | |
| | \* | Attorney's Fees and Costs; |
| v. | \* | Reasonable Attorney's Fees; |
| | \* | Litigative Risk Settlement; |
| SECRETARY OF HEALTH AND | \* | Non-Forum Hourly Rate; |
| HUMAN SERVICES, | \* | Guardianship Costs. |
| | \* | |
| Respondent. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Paul S. Dannenberg*, Huntington, VT, for Petitioner.

*Glenn A. MacLeod*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION AWARDING ATTORNEY'S FEES AND COSTS[1]

On November 13, 2006, Natalia Glaser filed a petition on behalf of her son, M.G., seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleged that M.G. experienced an encephalopathy and other neurological injuries as a result of the Diphtheria-Tetanus-acellular Pertussis ("DTaP") vaccine that he received on or about December 1, 2003. After a protracted litigative risk settlement process, the parties eventually stipulated to a damages award that was reduced to judgment on August 13, 2015. ECF No. 106.

---

[1] Because this decision contains a reasoned explanation for my actions in this case, I will post it on the United States Court of Federal Claims website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole decision will be available to the public. *Id*.

[2] The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. § 300aa-10 through 34 (2012)). For purposes of brevity, all subsequent references to sections of the Act herein shall omit the 42 U.S.C. §§ 300aa prefix.

On February 3, 2016, Ms. Glaser moved for an award of Attorney's Fees and Costs ("Fees Application") in the total amount of $208,307.39 (ECF No. 109). Respondent has reacted to (without formally opposing) the Fees Application, suggesting that it is too high. Because Petitioner prevailed in this case, she is entitled to an award of fees and costs, but those sums must be reasonable – and even though Respondent has not formally objected to the request, or identified specific components of it as questionable, I find in the exercise of my discretion that the total sum requested should not be awarded. Instead, Petitioner is entitled to a total award of **$165,254.95**.

## I.      Procedural History

This action was filed nearly ten years ago, and in its course the Petitioner was represented by different attorneys. A brief review of the case's procedural history, in comparison to what the attorney invoices submitted in conjunction with the Fees Application reveal about attorney tasks performed during the case's pendency, will aid in calculating Petitioner's fees award.

At the time of the case's filing in November 2006, Petitioner was represented by the law firm of Conway, Homer & Chin-Caplan, P.C. (the "Homer Firm"). As the billing invoices submitted in connection with Homer Firm's portion of the Fees Application reveal, Ms. Glaser brought the case to the Homer Firm in October 2006, a month before it was filed. *See* ECF No. 109-6 (Homer Firm portion of fees application, dated Oct. 24, 2014) ("Ex. 5").[3] Because M.G. received the DTaP vaccine on December 1, 2003, with onset of his neurologic injuries alleged to have occurred that same day, however, it is readily evident that time was of the essence in filing the petition.

The Homer Firm subsequently represented Petitioner until January 22, 2008, when the special master presiding over the case granted the consent motion to substitute in present counsel – Paul Dannenberg, Esq. *See* Jan. 22, 2008, Order (ECF No. 25). In the intervening approximately 14-month period, the Homer Firm assisted Petitioner's efforts at gathering relevant medical records, requesting subpoenas where necessary and filing the obtained materials. The Homer Firm also prepared and filed an amended petition on June 7, 2007 (ECF No. 16), and began the process of obtaining a medical expert. However, Petitioner did not file an expert report before the Homer Firm's withdrawal (and in fact had requested two extensions to do so before the Homer Firm actually moved to withdraw on September 17, 2007 (ECF No. 21)).

The promised expert report thereafter remained unfiled from the time of Mr. Dannenberg's appearance until September 2009 (although Petitioner repeatedly sought extensions of time in

---

[3] Individual sections of the fees application are referred to throughout this decision using ECF numbers because the manner in which they were filed made it difficult to distinguish otherwise.

which to file it). *See, e.g.*, June 16, 2008, Scheduling Order (ECF No. 30); Motion, dated Dec. 3, 2008 (ECF No. 33). It is very difficult to ascertain from the docket and case files what was obstructing the case's progress during that 21-month period. The invoices submitted by two of Petitioner's experts – Dr. Shailesh M. Asaikar and Dr. Carl J. Crosley – reveal that both consulted with Petitioner during this time. Dr. Crosley performed some work on the matter in the summer and early fall of 2008, and then Dr. Asaikar was contacted, and performed some preliminary acts between January and June 2009. ECF No. 109-5 at 2 and 6. As reflected in a March 2008 Scheduling Order, Petitioner had informed the special master then presiding over the case that she was still attempting to finalize an expert report, consistent with the Homer Firm's earlier representations. *Compare* June 8, 2007, Status Conference Order (ECF No. 17) *with* March 12, 2008, Status Conference Order (ECF No. 28).

As the invoices submitted in connection with the fees application establish, in the fall of 2007 (just prior to appearing in the case) Mr. Dannenberg billed less than eight hours to the matter. ECF No. 109-3 at 1 and 2. In 2008 and 2009, he added only a total of approximately 80 hours more. *Id.* at 2-14. His billing records reflect contact with Drs. Crosley and Asiakar, consistent with their own invoices. *See, e.g., Id.* at 6, 9, and 12. While the amount Mr. Dannenberg billed in these two years was modest, it remains difficult to determine, after the fact, what was causing delay in the case (and why Mr. Dannenberg needed to request multiple extensions to file an expert report in this period). *See* ECF Nos. 31, 32, 33, 34, 35, 38, 39, 41.

Respondent formally moved on September 24, 2009, to suspend the deadline for her Rule 4(c) report (ECF No. 43) in order to explore settlement, and the motion was granted. Thereafter, the case remained in a litigative risk settlement limbo for more than four years. Even if Respondent played a role in allowing the case's delay, this is an excessive amount of time for a case to languish – and the billing records submitted in support of the present fees application do not illuminate the cause for this delay. Thus, from the beginning of 2010 until the end of 2012, Mr. Dannenberg billed approximately 100 hours in total to the matter, with no discernible progress in settling it. ECF No. 109-3 at 14-24; ECF No. 109-4 at 1-7. The case docket reveals that 15 status reports were filed in this period, many of which were similar in content, and therefore provided little to substantiate progress toward the case's resolution. *Compare* ECF Nos. 71 and 72. At best, by December 2010 Mr. Dannenberg had contacted Ms. Liz Holakiewicz, RN, BSN, CCM, CNLCP and initiated the process of involving her in the preparation of a life care plan – as her own invoices establish in great detail. *See* ECF No. 109-5 at 11.

In 2013, the attorney billing records reveal that Mr. Dannenberg and Ms. Holakiewicz were working toward completion of the life care plan. ECF No. 109-4 at 7-11. As a result, Mr. Dannenberg devoted more time to the matter than in the past, billing almost twice as many hours

in 2013 as he had in 2012. *Id.* at 7-13. In addition, Petitioner filed a report from Dr. Robert Hall, her vocational expert. *See* June 10, 2013, Notice of Filing (ECF No. 77).

I was assigned this case on January 14, 2014. ECF No. 81. I reminded the parties at the first status conference I held in the action that it had been pending by that time for over seven years, and accordingly urged them to complete their settlement discussions. *See* Feb. 12, 2014, Scheduling Order (ECF No. 84). Even so, multiple additional status conferences were held in the next 13 months, as the matter continued to grind on. By September 26, 2014, however, the parties at long last filed a joint life care plan (ECF No. 95), and then six months later requested a 15-week order (thus signaling that they had begun formulating settlement terms requiring formal approval from the Department of Justice – a process that can take several weeks). *See* Mar. 27, 2015, 15-Week Order (ECF No. 100). From 2014 on, Mr. Dannenberg demonstrated the most diligence in working on the matter as at any time in his involvement, billing over 90 hours alone to the case in 2014. ECF No. 109-4 at 13-19.

After my July 27, 2015, Decision adopting the parties' settlement stipulation, judgment was entered in August of that same year, awarding the Petitioner in excess of one million dollars for M.G.'s injuries. *See* Aug. 15, 2015, Judgment (ECF No. 106).

## II.    Fees application

Ms. Glaser's Fee Application has several components. First, she requests $132,222.50 for Mr. Dannenberg's services in the case, calculated at a rate of $325 per hour for work performed from 2007 to 2011, and then $350 per hour for all work thereafter. Fees Application at 3. In support of the rate request, she offers a series of affidavits – one from Mr. Dannenberg himself that largely speaks to his individual expertise (ECF No. 109-1); a 2013 affidavit (likely recycled from a different case) from James Spink, Esq., establishing his local hourly rate of $185 to $275 per hour (ECF No. 109-2); a 2010 affidavit from Gordon Troy, Esq., that purports he charges a rate of $325 per hour in Vermont (*id.)*; and a 2013 affidavit from Stephen Soule, Esq., establishing Mr. Soule's hourly rate for civil litigation to be $250 to $305 per hour (*Id.*).

Second, Ms. Glaser asks for a fees award to reimburse the Homer Firm for its initial services in the case from the time of filing in 2006 until its withdrawal 14 months later. ECF No. 109-6 at 1-33 (Tab A). Specifically, she requests attorney's fees in the sum of $8,609.80, plus paralegal and law clerk costs in the sum of $9,101.50, for a total of $17,711.30. *Id.*

In addition, Ms. Glaser seeks $2,114.25 in litigation costs incurred by the Homer Firm (exclusive of paralegal costs), and $12,506.83 in costs incurred by Mr. Dannenberg. Fees Pet. at 4, and Ex. 5. She asks for reimbursement of expert costs incurred through services provided by her

three experts: Dr. Asiakar, ($5,760), Dr. Hall ($4,582.50), and Dr. Crosley ($2,400). Fees Pet. at 4. And she requests a significantly greater amount for Ms. Holakiewicz, her life care planner ($24,220.51). Petitioner also asks for $9,254.50 to be paid to a separate attorney, Donald Scoggins, Esq., who appears to have assisted her in obtaining the guardianship that was required by the judgment in this case (as per the settling stipulation) at a rate of $415 per hour. Fees Pet. at 4; Scoggins billing records (ECF No. 109-7) at 1-3; Judgment, dated Aug. 13, 2015 (ECF No. 106) at 1 (second bullet point).

Respondent filed a brief commenting on Petitioner's Motion on March 4, 2016. ECF No. 111 ("Resp."). In it, Respondent disclaims any substantive role in adjudicating the present fees application, leaving it to my discretion to determine whether the rates and hours requested are reasonable. Resp. at 1-2. However, Respondent proposes that the appropriate "range" for fees and costs in this case is between $65,000 and $85,000, citing some Program decisions in which Mr. Dannenberg acted as counsel, but no other authority in support of her position. *Id.* at 2 n.2.

Petitioner filed a reply in further support of the Fees Application on March 29, 2016. ECF No. 113 ("Reply"). She notes that the case was complex, stressing the number of experts whose input was required for its successful settlement, and that the ultimate award in the case exceeded one million dollars. Reply at 1-2. She also asks that I disregard the Respondent's reaction to the fees application, given its conclusory and blanket character. *Id.* at 3-5. In effect, she argues, Respondent requests a 60 percent reduction in fees and costs incurred in the matter but does not provide substantiation for such a cut. *Id.* at 6. The fees application may now be decided.

## III.   ANALYSIS

### A.   General Principles Regarding Attorney's Fees and Costs Awards

Vaccine Program petitioners who receive compensation for their injuries are by statute entitled to an award of attorney's fees and costs. However, such fees and costs must be "reasonable." Section 15(e)(1). It is for the special master to evaluate and decide whether this is the case. *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994). To this end, special masters have discretion in determining what a reasonable fees award is, and may reduce hours *sua sponte*, apart from objections raised by Respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 208-09 (2009); *Perreira*, 27 Fed. Cl. at 34 (special master has "wide discretion in determining the reasonableness" of attorney's fees and costs).

The special master is not obligated to evaluate a fees application on a line-by-line basis. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521-22 (Fed. Cir. 1993) (approving the special master's elimination of 50 percent of the hours claimed); *see also Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 728–29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction in the number of hours from 515.3 hours to 240 hours); *Edgar v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 506 (1994) (affirming the special master's awarding only fifty-eight percent of the numbers of hours for which compensation was sought). Rather (as the United States Supreme Court instructs) when awarding attorney's fees special masters may use estimates to achieve "rough justice." *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

Determining the appropriate amount of a fees award is a two-part process. The first part involves application of the lodestar method – "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). The second part involves adjusting the lodestar calculation up or down. *Avera*, 515 F.3d at 1348. This standard for calculating a fee award is considered applicable in most cases where a fees award is authorized by federal statute. *Hensley v. Eckerhart*, 461 U.S. 424, 429-37 (1983).

An attorney's reasonable hourly rate is more precisely understood to be the "prevailing market rate" in the relevant forum. *Avera*, 515 F.3d at 1349; *Rodriguez v. Sec'y of Health & Human Servs.*, No. 06-559V, 2009 WL 2568468, at \*2 (Fed. Cl. Spec. Mstr. July 27, 2009), *mot. for rev. den'd*, 91 Fed. Cl. 453 (2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. 2011). That rate is in turn determined by the "forum rule," which bases the award rate on rates paid to similarly qualified attorneys in the forum in which the relevant court sits (Washington, DC for Vaccine Act cases); except where an attorney's work was not performed in the forum and there is a substantial difference in rates. *Avera*, 515 F.3d at 1348. This is the *Davis* exception to the forum rule, which applies if the bulk of the attorney's work was performed outside of Washington, DC, in a location where prevailing rates are substantially lower than the forum rate. *Avera*, 515 F.3d at 1349 (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

After the hourly rate is determined, the reasonableness of the total hours expended must be considered. *Sabella*, 86 Fed. Cl. at 205-06. This inquiry mandates consideration of the work performed on the matter, the skill and experience of the attorneys involved, and whether any waste or duplication of effort is evident. *Hensley*, 461 U.S. at 434, 437.

Evaluating an attorney's fees application involves more than the mere performance of a mathematical calculation. In all stages of the lodestar calculation, I must determine if the fees applicant has established the reasonableness of the billing rate and work performed. *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986) ("[i]t remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero").[4] Quoting a decision by the United States Supreme Court, the Federal Circuit has characterized the contours of a reasonable fee request:

> The [trial forum] also should exclude from this initial fee calculation hours that were not "reasonably expended." . . . Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."

*Saxton*, 3 F.3d at 1521 (quoting *Hensley*, 461 U.S. at 433-34).

Petitioners bear the same reasonableness burden in seeking an award of costs. *Perreira*, 27 Fed. Cl. at 34; *Presault v. United States*, 52 Fed. Cl. 667, 670 (2002). When petitioners fail to carry this burden, such as by not providing appropriate documentation to substantiate a requested cost, special masters have refrained from awarding compensation. *See, e.g.*, *Gardner-Cook v. Sec'y of Health & Human Servs.*, No. 99-480V, 2005 WL 6122520, at *4 (Fed. Cl. Spec. Mstr. June 30, 2005). This practice is consistent with how the Federal Circuit and the Court of Federal Claims (the courts responsible for reviewing the decisions of special masters) have interpreted other federal fee-shifting statutes. *See Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 404 (Fed. Cir. 1987) (interpreting the Equal Access to Justice Act); *Presault*, 52 Fed. Cl. at 679 (interpreting the Uniform Relocation Assistance and Land Acquisition Policies Act of 1970).

## B.     Attorney's Fees and Related Costs Issues

The first matter presented by Petitioner's Fees Application is what the lawyers who represented her for the nearly ten years the case was active should be paid. I address this question in temporal order of their representation.

---

[4] Although *Mares* did not interpret the Vaccine Act's fees provisions, other fee-shifting statutes are interpreted similarly. *Avera*, 515 F.3d at 1348.

1.     Homer Firm Fees and Costs

Based on my review of the Fees Application, and in the exercise of my discretion, I find no cause to reduce the requested hours or rates for work provided by the Homer Firm from the time they first discussed the case with Ms. Glaser in October 2006 until their withdrawal in January 2008. The Homer Firm performed much of the initial "heavy lifting" in the case, as the submitted invoices reveal, such as records gathering, analysis of the medical records and facts underlying the claim, and discussions with the client about the cases' course. The rates they request are consistent with current views about in-forum rates among the special masters (including my own), and have not otherwise been objected to by Respondent. *Dixon v. Sec'y of Health & Human Servs.*, No. 13-22V, 2015 WL 8718278, at \*1 (Fed. Cl. Spec. Mstr. Nov. 23, 2015) (citing *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015)).

The Homer Firm's fees application also, however, includes time billed to the matter after withdrawal. Such time entries consist of various Homer Firm lawyers monitoring the case's progress between February 2008 and the fall of 2014. ECF No. 109-6 at 13-15. In particular, Homer Firm attorneys billed a total of $1,150.60 to the matter between January 2008 and October 2014, plus $134.40 in paralegal time. *Id.* Such time should not be reimbursed, since it was not incurred in representation of Ms. Glaser. To the extent it reflects time necessarily devoted to keeping track of the case's progress (so that the Homer Firm could request fees at the appropriate time), it still constitutes administrative time not properly billed to this matter, especially given than present counsel has handled that task. I will accordingly not award $1,285 in attorney and paralegal fees generated for this period. Subtracting that amount from the fees requested, I hereby award **$16,560.70** for the attorney services of the Homer Firm, plus paralegal and law clerk costs incurred before the Homer Firm's withdrawal.

2.     Mr. Dannenberg's Fees

Petitioner asks that Mr. Dannenberg (who represented her for the majority of the case's life) be compensated at a rate of $325 per hour for work performed before 2011, and $350 per hour for all subsequent work. While these rates are consistent with what are at present considered the forum rates for Vaccine Program practitioners under *McCulloch*, Mr. Dannenberg practices law in a region outside the forum – Huntington, Vermont – where prevailing market rates are lower, making the *Davis* exception applicable. *See, e.g., Warfle v. Sec'y of Health & Human Servs.,* No. 05-1399V, 2012 WL 4845635, at \*18-24 (Fed. Cl. Spec. Mstr. Sept. 21, 2012) (awarding Mr. Dannenberg $206 per hour for work performed from 2009 to 2011, discounted downward for inflation in prior years); *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2011 WL 3705153, at \*7-17 (Fed. Cl. Spec. Mstr. July 25, 2011) (awarding Mr. Dannenberg $200 per hour

for work performed 2008 to 2010), *mot. for review den'd,* 2011 WL 6292218 (Fed. Cl. Nov. 22, 2011).

Petitioner has not established persuasive grounds for revisiting these well-reasoned decisions. The special masters who decided *Warfle* and *Hocraffer* determined that Mr. Dannenberg practiced in a non-forum locale, and Ms. Glaser has failed to show sufficient changed circumstances to conclude otherwise. *Hocraffer*, 2011 WL 3705153, at *16-17. Nor has she established that the bulk of the work in this case was performed outside of Vermont – a relevant consideration when determining if the *Davis* exception applies. *Warfle*, 2012 WL 4845635, at *19 (citing *Avera,* 515 F.3d at 1349). To the contrary – the invoices submitted in support of the fees application reveal that Mr. Dannenberg was able to conduct case management from his home with relative ease (especially since the parties' life care planner, Ms. Holakiewicz, travelled for the case in the process of identifying the costs of M.G.'s future care).

The sole case Petitioner cites in support of the in-forum rate request is *Schueman v. Sec'y of Health & Human Servs.*, No. 04-693V, 2010 WL 3421956 (Fed. Cl. Spec. Mstr. Aug. 11, 2010); Fees Pet. at 2. In *Schueman*, Mr. Dannenberg was awarded the rate of $300 per hour for work performed after 2007, based on the special master's finding that the *Davis* exception did not apply. *Schueman*, 2010 WL 3421956, at *5. *Schueman* predates both *Hocraffer* and *Warfle*. In *Hocraffer*, however, the special master determined that the proper application of the *Davis* exception – which, as the Federal Circuit made clear in *Avera*, is intended to prevent windfalls to counsel who do the "bulk" of their work outside of Washington, DC (*Avera,* 515 F.3d at 1349 (citing *Davis*, 169 F.3d at 759-60)) – resulted in the conclusion that Mr. Dannenberg's home forum could not be considered equivalent to the Vaccine Program forum. *Hocraffer,* 2011 WL 3705153, at *15. In addition, the *Hocraffer* special master noted that the affiant support offered to establish the higher requested rate for Mr. Dannenberg came from Vermont practitioners whose rates either undercut the petitioner's argument (because, for example, they were lower), or were attorneys whose practices had not been established to be equivalent to Vaccine Program work. *Id.* at *14.

I find *Hocraffer* and *Warfle* to be more comprehensive in their analysis than *Schueman*, and thus more persuasive. For that reason, as well as the others cited above, I decline to award Mr. Dannenberg a forum-equivalent rate. This case in particular provides a good example why Vaccine Program litigation does not typically involve the same challenges as other federal actions (which is one of the many reasons that even in-forum rates paid to attorneys in the Program can be lower than what they might otherwise be able to command for other kinds of litigation). Mr. Dannenberg received the case from another skilled practitioner who managed it effectively in its first stages. Thereafter he oversaw its slow progress toward settlement from his local forum, relying heavily on the skills of a capable life care planner. He never needed to travel for the matter. Petitioner is

unquestionably entitled to a fees award in this case, but at rates that reflect the work involved – as the Act envisions.

Despite the above, Mr. Dannenberg's experience in the Program merits some rate increase since *Hocraffer* and *Warfle* were decided, above and beyond any inflation adjustments. I may make such an adjustment in determining the proper hourly rate to be awarded in this particular case. *Hocraffer*, 2011 WL 6292218, at \*10-11. For although controlling law prohibits him from receiving a windfall attributable to his business location and comparative lower expenses, it does not also mandate that I ignore completely an attorney's expertise in litigating Vaccine Act claims. Mr. Dannenberg's experience in litigating Vaccine Program litigation played a role in the successful conclusion of the case.

I therefore determine that **$225 per hour** is an appropriate non-forum rate for Mr. Dannenberg for work performed before 2011. The increased rate reflects Mr. Dannenberg's overall experience in the Program, but also is well within the bounds set by the *Davis* exception. For all subsequent work, I will increase the rate in order to take account of inflation (since downward adjustment is similarly appropriate when a rate is retroactively applied). *Hocraffer*, 2011 WL 3705153, at \*17-19 (appropriate rate for current work cannot be applied retroactively to work done in previous years, as doing so would effectively be the equivalent of charging the government interest). Employing the CPI Calculator,[5] Mr. Dannenberg's rate of $225 an hour should be adjusted upward to $230 in 2012, $233 in 2013, $237 in 2014 and 2015,[6] and $238 for 2016.

3.       The Reasonableness of Hours Billed by Mr. Dannenberg

The second issue presented by Petitioner's Fees Application is whether all of Mr. Dannenberg's time billed to this matter should be included in the fees award. The invoices provided reveal that he billed approximately 395 hours to this matter in the eight-plus years he worked on it. Respondent has offered no specific objections to any time entries or categories. In an overall view of the individual line-items billed to the matter, I identified no specific instances of overbilling – a task performed that was glaringly unnecessary, for example, or evidence of excessive time devoted to a matter that did not warrant such effort, or could have been more

---

[5] The Bureau of Labor Statistics has a Consumer Price Index ("CPI") inflation calculator, which calculates the average CPI for a given calendar year. *CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/cpicalc.pl (last visited May 27, 2016) ("CPI Calculator"); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 100 Fed. Cl. 750 (2011) (employing CPI calculator to determine whether cost of living had risen following the passage of the Equal Access to Justice Act).

[6] There was minimal inflation between 2014 and 2015 and thus $237 had essentially the same buying power in 2014 as it did in 2015.

efficiently performed by a legal assistant. In this case, the opposite is the problem – Mr. Dannenberg consistently billed little time at all to the matter, and I must therefore determine to what extent he should be compensated for not prosecuting this matter as expeditiously as he could have.

The context in which work was performed on this matter is highly relevant. As noted above, the initial work on this case – its primary vetting – was performed by a different law firm. Then, less than two years after Mr. Dannenberg became active in the case in early 2008, its progress ground to a virtual halt for the next five years. From January 2008 until the end of 2012, Mr. Dannenberg never billed more than 45 hours total to the matter for an entire year – the equivalent of a week's worth of effort for a fairly busy attorney. From 2010 until the time the matter was assigned to me, the parties filed nearly 20 status reports as to their progress in resolving the case. Only by 2014, when I began to harry the parties about the case's inertia (in the interests of Ms. Glaser and her child) did Mr. Dannenberg's billing on the matter increase.

It is true that this matter was successfully concluded in the Petitioner's favor. From my review of the records offered in support of the fees application, I do not question that the efforts of the experts and life care planner took time, and productively aided the case's resolution (and, as set forth below, I am compensating them accordingly). Also, there is no evidence in the record of Respondent complaining about the case's slow progress, nor did the special masters previously responsible for the matter ever express such concerns. And even though the matter did not require a hearing, that fact does not suggest to me that it should inherently have "cost" less. *See Thomas v. Sec'y of Health & Human Servs.*, No. 92-46V, 1997 WL 74664, at *6 ("[t]he court rejects respondent's belief that because a case settles without a hearing the fees and costs should be relatively low").

But such facts do not excuse counsel from acting expeditiously. Attorneys representing petitioners alleging vaccine injuries should prosecute their clients' claims with as much speed as possible – especially where, as here, the injured party has ongoing care needs that the entitlement award will address. The fact that a case has complex issues, or ultimately settles for a large sum, does not diminish such obligations. Here, it simply does not appear that counsel consistently acted as diligently as possible – and therefore not all of the time devoted to the matter was reasonably spent.

4.    Adjustment of Mr. Dannenberg's Fees Award

In light of the above, "rough justice" demands that Mr. Dannenberg's total award be trimmed. In a case in which counsel plainly overbilled, the solution would be simple. Here, however, the billing records reveal numerous years in which counsel did little work on the matter,

and therefore cannot be accused of overbilling. What is more, I must give some consideration to the fact that Petitioner's life care planner worked diligently on the matter. It is reasonable for counsel to pull back from acting on a case while a life care planner performs her functions. In the exercise of my discretion, I therefore order as follows with respect to Mr. Dannenberg's time spent on the case:

(a) Petitioner is awarded the total sum of Mr. Dannenberg's time for work performed in 2007 and 2008, when he first began to represent her and was attempting to finalize an expert report;

(b)  For the years 2009 to 2013 (a five-year period, and the height of the time during which little progress was made in the case's resolution), I hereby **reduce by ten percent** the rate set forth above as appropriate for Mr. Dannenberg in each relevant year, to account for his lack of diligence in prosecuting the case, but award all time billed to the matter; and

(c) Petitioner is awarded all time billed to the matter from 2014 to the present, at the rates set forth above.

Based on the rates set above, I arrive at the following sums for the relevant years:

2007: 7.8 hours x $225 rate = $1,755

2008: 44.4 hours x $225 rate = $9,990

2009: (.9 x 35.1 hours) x $225 rate = $7,107.75

2010: (.9 x 31.8 hours) x $225 rate = $6,439.50

2011: (.9 x 39 hours) x $225 rate = $7,897.50

2012: (.9 x 28.7 hours) x $230 rate = $5,940.90

2013: (.9 x 51.9 hours) x $233 rate = $10,883.43

2014: 90.4 hours x $237 rate = $21,424.80

2015: 40.9 hours x $237 rate = $9,693.30

2016: 24.7 hours x $238 rate = $5,878.60

**Total:** $87,010.78


5.      Mr. Dannenberg's costs

Mr. Dannenberg also seeks reimbursement of $12,506.83 in costs, reflecting copying, telephone charges, postage, and similar costs (but exclusive of sums provided directly by Petitioner), as well as expert retainer costs paid by counsel. Respondent identifies no objection to these costs, and I have not ascertained any instances in which a cost specifically associated with the performance of attorney tasks was improper. Accordingly, I hereby award in full these requested costs.


**C.      Guardianship Costs**

The Fees Application includes a request for $9,254.50 in attorney's fees incurred in establishing a guardianship in California for the benefit of M.G., based on work performed between July 2014 and January 2016 by Donald L. Scoggins, Esq. The parties' stipulation expressly conditioned payment of the damages award on the creation of a proper guardianship, and that requirement was incorporated into the Judgment. *See* ECF No. 106.

It is reasonable for a petitioner such as Ms. Glaser to request reimbursement of guardianship costs when they are contemplated in advance as a condition of the damages payment. Costs incurred in direct connection with the terms of a judgment can be reasonably construed as "proceedings on a petition" (Section 15(e)(1)) because they are only incurred as a condition of payment. *See Gruber v. Sec'y of Health & Human Servs.*, 91 Fed. Cl. 773, 782 (2010). Special masters (including me) have therefore awarded such costs where the guardianship is established as a condition of the settlement and/or judgment in the matter. *See, e.g., Barrett v. Sec'y of Health & Human Servs.*, No. 09-389V, 2014 WL 2505689, at *5 (Fed. Cl. Spec. Mstr. May 13, 2014); *Torres v. Sec'y of Health & Human Servs.*, No. 09-867V, 2013 WL 2256136 (Fed. Cl. Spec. Mstr. Apr. 30, 2013); *Cansler v. Sec'y of Health & Human Servs.*, No. 09-596V, 2011 WL 597791 (Fed. Cl. Spec. Mstr. Feb. 2, 2011); *Ceballos v. Sec'y of Health & Human Servs.*, No. 99-97V, 2004 WL 784910 (Fed. Cl. Spec. Mstr. Mar. 25, 2004).

13

This does not, however, end the analysis. The total fees incurred in preparation of the guardianship exceed $9,000 – above the high end of recent similar damages awards. *See Sucher v. Sec'y of Health & Human Servs.*, No. 07-58V, 2013 WL 5532179, at *23-24, Appendix A (Fed. Cl. Spec. Mstr. Sept. 17, 2013) (setting forth 18 Program cases between 2009 and 2013 in which guardianship fees and costs were awarded, in a range between $1,750 and $8,500). Moreover, the requested amount is based on Mr. Scoggins's claimed $415 hourly rate – greater than what in-forum California attorneys command for Program work. *See, e.g.*, *Guerrero v. Sec'y of Health & Human Servs.*, 120 Fed. Cl. 474, 485 (2015) (awarding experienced California Vaccine Program counsel $365 per hour for work performed in 2012 and 2013). Even when the work to establish a guardianship is complex, such a cost should remain ancillary, rather than equivalent to, the cost of competent Program counsel directly representing a petitioner.

From review of the submitted invoices, it appears the work performed by Mr. Scoggins was necessary for the guardianship's creation. In keeping with the dragged-out character of the case, it took well over a year for Mr. Scoggins to complete the process of establishing the guardianship – although the billing record submitted in support of this component of the fees application reveals that the filing was opposed, which might explain the heightened cost. ECF No. 109-7 at 1-3. Nevertheless, this component of the overall fees application is subject to the same reasonableness considerations that govern the fees calculations. *Perreira*, 27 Fed. Cl. at 34. Mr. Scoggins's requested hourly rate ($415 per hour) is high for the nature of the work performed, and Petitioner has not established that the rate was comparable to what other California attorneys would charge for similar services; indeed, she offers no explanation at all to justify it. *Lilley v. Sec'y of Health & Human Servs.*, No. 09-31V, 2012 WL 1836323, at *6-7 (Fed. Cl. Spec. Mstr. Apr. 30, 2012) (reducing by half requested guardianship costs where Petitioner failed to establish their reasonableness).

Accordingly, I will award fees for Mr. Scoggins's time at the requested hourly rate, but reduce the amount of time by ten percent, resulting in an award for guardianship costs of **$8,329.05** (10 percent of 22.3 hours at $415 per hour). This sum is more consistent with the range observed in *Sucher*.

### D.     Expert Costs

Petitioner first asks for $2,400 in costs for the services of Dr. Carl Crosley, who charged $400 an hour for work performed in the late summer and early fall of 2008. ECF No. 109-5 at 6. At that time, the docket reveals that Petitioner expected to offer an expert report, and the six hours Dr. Crosley spent on the matter doing initial work to prepare a report, as well as his rate, appear reasonable. I therefore award the entirety of this sum requested or **$2,400.**

14

Next, Ms. Glaser seeks $5,760 for Dr. Asaikar's 12.8 hours of work performed on the matter. As the submitted invoices show, Dr. Asaikar was first contacted by Petitioner's present counsel in January 2009, when Petitioner was still indicating her intent to file an expert report. Ex. 4 (ECF No. 109-5) at 2. He performed work on the matter, including review of medical records and initial preparation of his opinion, until June 2009 – three months before Respondent proposed suspension of her Rule 4(c) Report (at which time the years-long litigative risk negotiation began). Then, in September 2011, Dr. Asaikar was contacted again to perform an independent medical examination of M.G., in order to obtain information used by Ms. Holakiewicz in the preparation of her life care plan (as her own separate invoices confirm). ECF No. 109-5 at 1 and 17. A status report from November 2011 also reflects this work. *See* ECF No. 63.

I conclude from the above that the work Dr. Asiakar performed was substantively important to the case, and will therefore award all of the time requested. However, the rate Dr. Asiakar charged for this work in 2009 and 2011 – $450 per hour – is excessive and not reasonable, given his role as a consulting rather than testifying expert. *Simon v. Sec'y of Health & Human Servs.*, No. 05-941V, 2008 WL 623833, at *8 (Fed. Cl. Spec. Mstr. Feb. 21, 2008) (differentiating services of a testifying expert from one who merely consults in a case, and compensating the latter at a lower rate). I will therefore reduce his rate to $350 per hour, and award costs for Dr. Asiakar's services in the amount of **$4,480**.

The third expert is Dr. Robert Hall. The sum requested for his services, $6,207.50, is tallied in three invoices from January, February, and April 2013. ECF No. 109-5 at 3-5. A status report filed around this time period indicates he was retained to "prepare a report concerning petitioner's vocational potential and rehabilitation requirements," and that the report would be used in conjunction with the preparation of Ms. Holakiewicz's life care plan. Status Report, dated Feb. 5, 2013 (ECF No. 74). Ultimately, Dr. Hall's report was in fact filed. ECF No. 77 (Summary of Vocational Rehabilitation Evaluation and Preliminary Opinions, dated April 10, 2013). Ms. Holakiewicz's invoices also reflect consultation with Dr. Hall. *See, e.g.*, ECF No. 109-5 at 17. Based upon those invoices, it appears Dr. Hall billed at a rate of $325 per hour. I find the rate to be reasonable for the services of a vocational expert, and the work performed reasonable as well – especially given that lost future wages were a significant component of the parties' stipulated damages. *See* Stipulation, dated July 27, 2015 (ECF No. 102) ¶ 8. I therefore award the full sum requested, or **$6,207.50.**

The largest expert-related cost requested is for the services of Ms. Holakiewicz, the Petitioner's life care planner. As the relevant invoices reveal (consistent with the case's docket), Ms. Holakiewicz was first retained to prepare a life care plan in this case in December 2010. ECF No. 109-5 at 11; Status Report, dated Dec. 6, 2010 (ECF No. 55). She thereafter worked on the

matter on a fairly consistent basis through September 2014 – almost four years – although the invoices reveal periods of significant work punctuated by lulls. ECF No. 109-5 at 11-20. The parties' joint life care plan, prepared by Ms. Holakiewicz, was then filed at the end of that same month. Joint Life Care Plan, dated Sept. 26, 2014 (ECF No. 95). Throughout Ms. Holakiewicz's retention, she billed her time at $200 per hour.

In this case, Ms. Holakiewicz's total charges for life care plan preparation are almost double what Petitioner's three other experts combined charged. Other special masters have noted, however, that, as the Vaccine Program has matured, the role of life care planners in assisting parties calculate damages awards has grown, and made their jobs more complex as well – resulting in their services becoming more expensive. *Ceballos v. Sec'y of Health & Human Servs.*, No. 99-97V, 2004 WL 784910, at *18 (Fed. Cl. Spec. Mstr. Mar. 25, 2004) (32 months of life care planner's services, amounting to total cost of approximately $17,000, was reasonable and therefore awarded). In addition, the rate Ms. Holakiewicz charged for her services in this case is consistent with what she has been awarded in other cases – as is the magnitude of the total sum requested. *See, e.g.*, *Brown v. Sec'y of Health & Human Servs.*, No. 09-426V, 2013 WL 1790212, at *5-6 (Fed. Cl. Spec. Mstr. Apr. 8, 2013) (awarding Ms. Holakiewicz approximately $38,000 for life care plan preparation services billed at $225 per hour, and citing other instances of higher charges awarded in Program cases).

I have reviewed Ms. Holakiewicz's detailed invoices, and the sum requested seems reasonable in light of the scope of the work she performed. Nor has Respondent identified any problems in the invoices. As I have already noted, bringing this case to its conclusion took an unreasonably long time, but I do not conclude from my review of the records and invoices submitted that Ms. Holakiewicz inefficiently performed her duties. I will therefore award her the full amount requested, or **$23,780.51** (ECF No. 109-5 at 20).

### E.      Petitioner's Direct Costs.

Pursuant to General Order No. 9, Petitioner has submitted a statement indicating that she contributed $2,000 of her own funds to prosecute the claim. ECF No. 109-9 at 1. Mr. Dannenberg has provided a breakdown of how those amounts were disbursed, such as to pay expert retainers or for certain records. *Id.* at 2. Based on my review of the fees application, I find that these disbursements are not duplicative of other components of the total award and are appropriately remitted to Petitioner in the entirety of the amount requested.

**CONCLUSION**

Based upon the above, and in the exercise of my discretion, I hereby award attorney's fees and costs as follows:

| Contested Sum | Amount Requested | Reduction | Total Awarded |
|---|---|---|---|
| Homer Firm Fees | $ 17,711.30 | $ 1,150.60 | $ 16,560.70 |
| Homer Firm Costs | $ 2,114.25 | $ 134.40 | $ 1,979.85 |
| Dannenberg Fees | $ 135,222.50 | $ 48,211.63 | $ 87,010.78 |
| Dannenberg Costs | $ 12,506.83 | none | $ 12,506.83 |
| Dr. Crosley Expert Fees | $ 2,400 | none | $ 2,400.00 |
| Dr. Asaikar Expert Fees | $ 5,760 | $ 1,280.00 | $ 4,480.00 |
| Dr. Hall Expert Fees | $ 6,207.50 | none | $ 6,207.50 |
| Ms. Holakiewicz's Life Care Planner Fees | $23,780.51 | none | $23,780.51 |
| Guardianship Costs | $9,254.50 | $925.45 | $8,329.05 |
| Petitioner's Direct Costs | $2,000 | none | $2,000.00 |

I reduce Petitioner's fee application by the amount of $51,702.08 as a result of the reduction in rate and number of hours, thereby awarding Petitioner a total of $103,571.48 in attorney's fees, plus $61,683.74 in costs. Accordingly, an award shall be made in the form of a check jointly payable to Petitioner and her counsel, Paul Dannenberg, Esq., in the amount of **$163,254.95**, and a check for $2,000.00 payable to Petitioner.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of this decision.[7]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.